John PIERCE, Plaintiff,

v.

F.R. TRIPLER & CO., INC., and Hartmarx Specialty Stores, Inc., Defendants.

No. 86 Civ. 8473 (WK).

United States District Court, S.D. New York.

March 25, 1991.

were frivolous and intended for harassment and delay.

On January 18, 1991 we heard oral argument on these motions, and on that date—for the reasons stated on the record—we determined that the verdict for plaintiff could not be set aside, and denied defendants' motion for a new trial. Accordingly, as plaintiff is the prevailing party, we presently address plaintiff's fee application and Rule 11 motion. We substantially approve plaintiff's application for attorneys' fees, with certain modifications noted in the discussion which follows; and—contrary to our intention as expressed during oral argument [1]—we grant plaintiff's Rule 11 motion.

Debra L. Raskin, Vladeck, Waldman, Elias & Engelhard, P.C., New York City, for plaintiff.

Grace A. Newton, Carey M. Stein, Hartmarx Corp., Chicago, Ill., for defendants.

## OPINION AND ORDER

WHITMAN KNAPP, District Judge.

This case arises out of a claim of age discrimination in violation of 29 U.S.C. § 621 *et seq.* (hereinafter the "ADEA"). On October 5, 1990 the jury returned a verdict for plaintiff, finding that the defendants violated the ADEA and that their actions were willful. Judgment awarding plaintiff $112,000 was entered on October 12. Pursuant to Fed.R.Civ.P. 50(b), on October 24 defendants moved for judgment notwithstanding the verdict, or in the alternative for a new trial, and on November 16 plaintiff moved, pursuant to 29 U.S.C. § 626(b), for attorneys' fees, costs and disbursements, and renewed a previously filed motion for Rule 11 sanctions asserting that certain motions made by the defendants in the course of discovery and during the trial

### ATTORNEY'S FEES

The complaint was filed on November 6, 1986. Plaintiff has at all times been represented by the firm of Vladeck, Waldman, Elias and Engelhard, P.C. (hereinafter "Vladeck firm"), and more specifically by Debra Raskin, a partner in that firm. Plaintiff contends that the attorneys and legal personnel who worked on this case should be compensated according to the following fee schedule:

| | |
|---|---|
| Judith Vladeck (senior partner) | $300/hr. |
| Debra Raskin (partner) | $200/hr. |
| Ann Vladeck (partner) | $200/hr. |
| Cary Bricker (associate) | $175/hr. |
| Dennis Parker (associate) | $175/hr. |
| Jill Roisen (associate) | $150/hr. |
| Stuart Lichten (associate) | $150/hr. |
| Law Clerks | $ 55/hr. |
| Paralegals | $ 45/hr. |

In support of the reasonableness of these rates plaintiff has submitted affidavits of attorneys who are experienced in employment discrimination litigation and who practice in the New York City area, each attesting to the fact that they charge hourly rates between $200 and $250 for such work. Plaintiff also informs us that in

---

1. During oral argument we indicated that we would withhold decision on the Rule 11 motion until after final determination of any appeal that might be taken from any other order(s) we should enter. However, preparing this opinion we came to realize that it would not be a proper exercise of discretion so to proceed. Should there be a reversal of any order entered in this case, any subsequent appeal from our disposition of the Rule 11 motion would probably present questions that had already been before the appellate court.

*County of Suffolk v. Long Island Lighting Co.* (E.D.N.Y.1989) 710 F.Supp. 1477 Judge Weinstein awarded legal fees to members of the Vladeck firm at the rate of $275/hr. for Judith Vladeck and $175/hr. for Anne Vladeck and Debra Raskin, and that more recently, in *Huntington Branch NAACP v. Town of Huntington* (S.D.N.Y.1990) 749 F.Supp 62, Judge Glasser awarded other experienced civil rights attorneys fees at the hourly rates of $225 for partners and $175 for associates. (Pl. Mem. at 4–5).

Plaintiff asserts that over the course of the last four years more than 2,000 individual hours of work have been expended in preparation and trial, and has submitted copies of time records to document how each hour was spent[2]. The time records include the date, the initials of the person recording the time, a description of the task performed and an estimate—in fifteen minute units—of the amount of time expended. In total plaintiff seeks to recover for:

| | | |
|---|---|---|
| 57.75 hours by | Judith Vladeck |
| 57.00 " | Anne Vladeck |
| 611.50 " | Debra Raskin |
| 323.00 " | Cary Bricker |
| 22.00 " | Dennis Parker |
| 25.50 " | Stuart Lichten |
| 54.75 " | Jill Roisen |
| 285.75 " | paralegals & law clerks |

By affidavit, Debra Raskin informs us that "[t]o the extent practicable, non-lawyers were used in preparation of the case … [and] in every way consistent with the maintenance of the highest professional standards, the least expensive level of personnel was employed for specific tasks". D.R.Affid. ¶ 3.

2. The affidavit submitted by Debra Raskin in support of this fee application divides the work performed into five phases: Phase I, May 1986 through January 1987 (consultation period, filing of the EEOC charge and federal court complaint, beginning of discovery); Phase II, February 1987 through October 1987 (discovery, motion practice concerning amended complaint); Phase III, November 1987 to April 1988 (response to defendants' motion for summary judgment); Phase IV, May 1988 to May 1989 (miscellaneous motion practice, drafting of pre-trial documents); Phase V, May 1989 to date (pre-trial preparations, trial, response to defendants'

In support of the claim for compensation of disbursements and costs, plaintiff submits copies of relevant expense vouchers and the affidavits of Cary Bricker and Debra Raskin attesting to the fact that all costs sought to be recovered are of the type normally charged to clients. Plaintiff also seeks recovery, among other things, of $13,638.43 for: the expert witness fee of Thomas Fitzgerald who testified at trial as to the calculation of damages, certain telephone calls and fax communications, photocopies, postage for special mailings, transportation, court fees, messenger service, clerical overtime, transcripts, certain witness fees and expenses, binding, LEXIS computer time, and some miscellaneous expenses.

## DISCUSSION

Section 626(b) of the ADEA[3] incorporates by reference § 216(b) of the Fair Labor Standards Act which provides in relevant part:

> The court … shall, in addition to any judgment awarded to the plaintiff … allow a reasonable attorney's fee to be paid by the defendant, and costs of the action.

29 U.S.C. § 626(b), § 216(b) (1990). The Supreme Court has asserted that the "most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate". *Hensley v. Eckerhart* (1983) 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40. This "lodestar" amount may then be enhanced by means of a multiplier pursuant to the court's evaluation of certain factors including the financial risks

Rule 50 motion, and the instant application for costs, disbursements, attorneys' fees and Rule 11 sanctions). D.R.Affid. at 5–18; *see* Bricker Affid. at 3 (adding charges for hours expended—during the period November 16, 1990 through January 4, 1991—responding to defendants' opposition to plaintiff's attorney fee application).

3. Section 626 is also known as the "Age Discrimination Claims Assistance Act of 1988". Pub.L. 100–283, Apr. 7, 1988, 102 Stat. 78.

counsel undertook in pursuing such litigation, e.g. the contingent nature of the case. *Pennsylvania v. Delaware Valley Citizens' Council* (1987) 483 U.S. 711, 729–31, 107 S.Ct. 3078, 3088–90, 97 L.Ed.2d 585; *see Blum v. Stenson* (1984) 465 U.S. 886, 899, 104 S.Ct. 1541, 1549, 79 L.Ed.2d 891. Plaintiff does not request any enhancement.

Defendants make several objections. They assert that both the rates charged by plaintiff's counsel and the number of hours expended are excessive and should be reduced, that plaintiff's inadequate documentation warrants a reduction in fees, that the costs of expert witness fees and administrative proceedings are not compensable under the ADEA, and that a reduction of the fee award is warranted in light of a damage award of only $112,000. We address each of these objections in turn.

### I. Hourly Rates

▮ The Court, in *Blum v. Stenson* (1984) 465 U.S. 886, 895–896, 104 S.Ct. 1541, 1547–48, 79 L.Ed.2d 891 has determined that a reasonable hourly rate is one which is "in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation". Relying on our own observations that the quality of representation offered by counsel in the instant case was outstanding, upon the affidavits submitted by plaintiff, and upon the determinations by other courts as to what is presently the prevailing market rate for counsel who specialize in discrimination law, we find that the rates of $300/hr. for the services of Judith Vladeck and $200/hr. for the services of other partners, namely Anne Vladeck and Debra Raskin, are reasonable. Although the fee charged here by Judith Vladeck is higher than that awarded in any similar case that has been brought to our attention, we observe that she is an exceptional attorney and widely recognized as an expert in the field of employment discrimination litigation. With respect to the fees of associates Cary Bricker and Dennis Parker, we view the experience of these persons as considerably less than that of Debra Raskin and Anne Vladeck,

*compare* D.R.Affid. ¶¶ 59, 60 *and* ¶¶ 56–58, and find insufficient support in the affidavits submitted to justify an award of $175/hr. Taking into account the recent determination by Judge Glasser that a fee of $135/hr. was an appropriate award for a civil rights attorney who had five years experience and had clerked for a judge of the Court of Appeals of the Third Circuit, we find that this same amount is appropriate for these individuals. *See Huntington*, 749 F.Supp. at 65; *cf. Sussman v. Vornado* (D.N.J.1984) No. 78–422–A (awarding associates in the Vladeck firm $100/hr.). Since plaintiff concedes that the experience of associates Jill Roisen and Stuart Lichten is less than that of Bricker and Parker, D.R.Affid. ¶¶ 61, 62, we proportionately reduce the rates chargeable by them, and assign $115/hr. as appropriate for their services. Noting that the fees requested for the services of paralegals and law clerks have not changed since 1984, *see Sussman, supra*, we find the respective charges of $45/hr. and $55/hr. to be more than reasonable and accordingly allow them.

### II. Time Expended

Although we can find fault with some of the time records submitted by plaintiff, we note that on the whole plaintiff has provided remarkably well kept documentation of the efforts expended by counsel in this lawsuit. Defendants have rightfully objected to the charge of $300/hr. for the eleven hours Judith Vladeck vouchered for attendance in court after the jury had begun its deliberations and for the eight hours Stuart Lichten spent "observing the trial". Plaintiff's counsel concedes in its reply papers that some of these charges were inadvertently included, Pl.Reply Mem. at 10 n. 9. Accordingly, of these disputed charges, we will allow compensation for only the three hours which Mrs. Vladeck spent reviewing settlement matters with the plaintiff and advising on damages negotiations.

▮ In response to defendants' objection that many of plaintiff's charges for "conferencing" are an abusive duplication of

fees, we note that defendants offer no evidence to support the conclusion that such conferences were a duplication of efforts, and find that it is not unreasonable to assign—over the course of four years—different attorneys to the various stages of a case necessitating several briefings and conferences. *See Soler v. G & U, Inc.* ((S.D.N.Y.1987) 658 F.Supp. 1093, 1099; *Lenihan v. City of New York* (S.D.N.Y.1986) 640 F.Supp. 822, 825 (quoting *Johnson v. University College of the University of Alabama* (11th Cir.) 706 F.2d 1205, 1208, *cert. denied,* 464 U.S. 994, 104 S.Ct. 489, 78 L.Ed.2d 684 (1983)) ("The retaining of multiple attorneys in a ... lengthy employment discrimination case ... is understandable and not a grounds for reducing the hours claimed."). Accordingly, given that plaintiff's counsel's affidavit informs us that the fees requested already reflect a reduction where duplication of efforts did in fact occur, absent more than mere conclusory statements that the charges requested are abusive, we decline—with one exception discussed below—further to reduce plaintiff's recovery for these expenses.

Cary Bricker joined the Vladeck firm shortly before this case went to trial. Trial counsel, Debra Raskin, elected to have Bricker assist her by sitting with her at the counsel table during the trial. This required Bricker to spend considerable time familiarizing herself with prior proceedings and with the various factual and legal questions expected to arise. While Raskin was perfectly competent to try the case unassisted by anyone, it is generally recognized that it should be left to a trial attorney to decide whether or not an in-court assistant would be helpful. *See e.g. Lenihan,* 640 F.Supp. at 825; *cf. New York Ass'n. for Retarded Child. v. Carey* (2d Cir.1983) 711 F.2d 1136, 1146 ("prevailing parties are not barred as a matter of law from receiving fees for sending a second attorney ... into court to observe and assist."). We agree with that proposition and therefore allow compensation for Bricker's

in-court time. However as there was no particularized need for the involvement of Bricker—as opposed to some other associate already familiar with the case—we disallow recovery for all time spent by Bricker familiarizing herself with the specifics of this case. As we see it, involving Bricker in this particular trial was a brilliant way of integrating a new associate into the firm. However defendants should not be asked to pay for that benefit to the firm. Accordingly we allow only such time as Bricker may have spent after the commencement of the trial.[4]

### III. Costs

■ Defendants object to plaintiff's inclusion in the costs of this litigation the $3,096 designated as an expert witness fee. Defendants correctly rely on *West Virginia University Hosp. Inc. v. Casey* (3d Cir.1989) 885 F.2d 11, for the proposition that expert witness fees are not compensable under the fee-shifting provisions of the Civil Rights Act. Def.Mem. at 13. On March 19, 1991 the Supreme Court affirmed that decision, 1991 U.S. LEXIS 1710. We therefore deny plaintiff recovery of the stated expert witness fee expense.

■ Defendants also object to plaintiff's inclusion of $230 for attorneys' fees relating to the drafting and filing of plaintiff's EEOC charge, and assert that such administrative proceeding costs are not recoverable under the ADEA. In *Oscar Mayer & Co. v. Evans* (1978) 441 U.S. 750, 99 S.Ct. 2066, 60 L.Ed.2d 609 the Supreme Court held that in states with agencies empowered to remedy age discrimination in employment plaintiff's must resort to administrative remedies prior to commencing a civil court action. 441 U.S. at 758, 99 S.Ct. at 2072–73. Given that plaintiff here seeks to recover only the costs of commencing this administrative remedy, we perceive that this expense is reasonably part of the requirements of adequately pursuing an age discrimination claim and accordingly is within the ambit of expenses intended to be

---

**4.** It may well be that plaintiff's application already largely complies with this ruling, as its reply memorandum (at p. 11) asserts that 25 hours of Bricker's time have been omitted. *See* Pl. Reply Mem. at 11.

recoverable by 29 U.S.C. § 626(b). *See Soler* 658 F.Supp. at 1097–1098 (permitting, pursuant to 29 U.S.C. § 216(b), the recovery of fees associated with administrative proceedings, and citing *Pennsylvania v. Delaware Valley Citizen's Council* (1986) 478 U.S. 546, 561, 106 S.Ct. 3088, 3096, 92 L.Ed.2d 439 for the proposition that "[a]n award for administrative proceedings critical to a party's rights is allowable and 'entirely proper and well within the "zone of discretion" afforded the District Court' ").

## IV. Recovery by Plaintiff

█ Defendants assert that in light of the fact that plaintiff will recover only $112,000 a reduction in the amount of fees to be awarded counsel is warranted to insure that such compensation is reasonable in relation to the results obtained. They cite *Riverside v. Rivera* (1985) 477 U.S. 561, 574, 106 S.Ct. 2686, 2694, 91 L.Ed.2d 466 as support for this proposition.

In *Riverside,* a plurality opinion, four justices asserted that "the amount of damages a plaintiff recovers is ... only one of many relevant factors that a court should consider in calculating an award of attorney's fees", *id.,* and a majority of the Court upheld a district court's determination that civil rights attorneys could recover $245,456.25 in compensation even though their clients received only $33,350 in compensatory and punitive damages. Realizing that the composition of the Court has since changed, we rely on factors similar to those which produced a majority decision and were enumerated in Justice Powell's concurring opinion. Specifically, we find that: 1) the jury having determined that the defendants discriminated against the plaintiff on the basis of age and that their actions were wilful, counsel prevailed in all material aspects of this litigation; 2) counsel demonstrated outstanding skill and experience; 3) many attorneys in the community would have been reluctant to institute or continue to prosecute this action; 4) subject to the minimal reductions we have discussed, the number of hours claimed to

have been expended were fair and reasonable; 5) counsel achieved excellent results for their client; and 7) the hourly rates employed in our determination of the lodestar figure are typical of the prevailing market rate for similar services by lawyers of comparable skill. *See id.* at 583, 106 S.Ct. at 2698–99. We further find that most of the hours plaintiff's counsel employed were occasioned by defendants' refusal to enter into good faith settlement negotiations and by their constant interposition of futile defenses. We accordingly find that there need be no adjustment solely to make the fee award proportionate to the recovery.

## THE RULE 11 MOTION

Plaintiff seeks sanctions for defendants' repeated efforts—allegedly in blatant disregard of Fed.R.Evid. 408—to introduce into evidence (and make other use of) a certain offer of employment defendants are claimed to have made in the course of attempts to settle plaintiff's claim of age discrimination.

█ Rule 408 provides that no offer to settle a law suit may be referred to at trial for the purpose of proving the validity or invalidity of a claim or its amount. *See, e.g., Cheyenne River Sioux Tribe v. United States* (Fed.Cir.1986) 806 F.2d 1046, 1050. However in an employment discrimination case an unconditional offer of reemployment, made *not in contemplation of settlement* but on the assumption that the law suit will proceed, may in some circumstance be offered in evidence for the purpose of establishing a limit on the recoverable damages. *Ford Motor Co. v. E.E.O.C.* (1982) 458 U.S. 219, 102 S.Ct. 3057, 73 L.Ed.2d 721. Consequently a critical question governing plaintiff's application for sanctions is: Was there a reasonable basis for believing that there could be a jury question as to whether or not defendants had made an unconditional offer of reemployment, i.e. one which was made on the assumption that it could be accepted without terminating the law suit? [5]

---

**5.** We limit our discussion to this question as it is   the only one considered by the parties. How-

## BACKGROUND

On November 24, 1987 defendants first injected into these proceedings the question of an alleged offer of employment by moving before Judge Duffy for partial summary judgment on the ground that an offer it had made to employ plaintiff at Wallachs, a subsidiary store of the defendants' (hereinafter "Wallachs offer") placed a cap on plaintiff's possible recovery. This motion was supported by an affidavit of Carey M. Stein, Esq. (hereinafter "First Affidavit"), who is general counsel to Hartmarx Corporation, a director and secretary of F.R. Tripler & Co., Inc., and who was then acting as trial counsel for the defendants in this law suit. In this affidavit Stein took the position that plaintiff's counsel had been specifically informed that the Wallachs job offer was not a settlement offer relative to any of plaintiff's claims of discrimination. *See* First Affid. ¶ 8.

The motion was opposed by an affidavit of Debra Raskin, Esq., plaintiff's attorney, who took the position that the alleged offer was not unconditional but contingent on plaintiff's abandonment of the lawsuit. In support of her position she stated, among other things, that when Stein first offered the Wallachs job to plaintiff, he stated: "Of course, we do not hire people who sue us". Raskin 12/87 Affid. ¶ 4. Defendants responded with a second Stein affidavit (hereinafter "Second Affidavit"), which reiterated his first position and specifically denied Raskin's statement, saying "at no time did I ever state to Ms. Raskin or anyone else that: 'Of course, we do not hire people who sue us' relative to the unconditional offer to plaintiff of a position as Controller for the Long Island City Warehouse (or any other matter)." Stein Second Affid. ¶ 3. On March 25, 1988 Judge Duffy denied defendants' motion for partial summary judgment by "memorandum endorsement" observing that questions of credibility had been presented.

On May 10, defendants filed a motion to withdraw Stein as counsel on the ground that he would be required to testify at trial to demonstrate the alleged unconditional nature of the Wallachs offer. On May 13, plaintiff made a motion *in limine* to exclude from the trial any reference to the alleged offer. This motion was supported by a Raskin affidavit substantially similar to the one used in opposition to the summary judgment motion. *See* Raskin 5/88 Affid. While these motions were pending before Judge Duffy the litigation was transferred to Judge Wood. Soon after the transfer, on September 16, 1988, defendants made a separate motion *in limine* for an order to limit plaintiff's damages on the grounds that the Wallachs offer was an unconditional offer of re-employment, and for the disqualification of plaintiff's counsel and the withdrawal of Stein as defendants' counsel on the ground that both Stein and Raskin would be required to testify as witnesses to the making of the alleged job offer. In support of this motion defendants again submitted a Stein affidavit (hereinafter "Third Affidavit") which substantially repeats the position asserted by Stein in the First and Second Affidavits.

In response to defendants' *in limine* motion and in further support of its own motion *in limine* plaintiff, on October 7, filed a motion for Rule 11 sanctions. In opposition to this motion, defendants' submitted a further affidavit by Stein (hereinafter "Fourth Affidavit") which reiterated the position Stein took in the previous three affidavits, and expressly reasserted, "I have never said '(O)f course, we do not hire people who sue us' to Ms. Raskin or to anyone else." Stein Fourth Affid. ¶ 3.

On February 23, 1989 Judge Wood held an evidentiary hearing on the motions pending before her. She received in evidence the correspondence about the alleged offer, Steins' Third Affidavit (marked as

---

ever it seems to us that plaintiff's *in limine* motion could have been granted pursuant to Fed.R.Evid. 403 on the separate ground that, regardless of whether or not the offer was unconditional, no offer of a job that could be terminated by the employer the day after the employee started working could serve to limit the employer's liability under the *Ford Motor Co.* doctrine; and that submitting such evidence to the jury would be hopelessly confusing.

Exhibit 1), and Raskin's opposing affidavit, and heard testimony of Stein and Raskin.

Stein testified that some time after May 13, 1986 he received a letter of that date from Raskin "regarding John Pierce's termination from Tripler's" (16) [6]. That letter, in its entirety, provided:

> We have been consulted by John Pierce concerning Tripler's decisions not to promote him to general manager and to terminate his employment. On the basis of the facts as he has presented them to us, we believe that Mr. Pierce has a meritorious claim of age discrimination.
>
> In the normal course, we would file charges of discrimination with the appropriate administrative agencies and pursue Mr. Pierce's claim through the courts, if necessary. Mr. Pierce, however, is reluctant to engage in litigation and we have offered to assist him in trying to work out an amicable resolution of this matter. If you believe a meeting for that purpose would be useful, please call for an appointment. If we do not hear from you within a week, however, we will assume that you do not wish to resolve this matter informally and will take whatever steps we deem appropriate to protect the interest of our client.

Stein replied with his letter of May 28 (11), which, in pertinent part, stated:

> Happily, Mr. Pierce's reluctance to engage in litigation gives us a perfect opportunity to exchange information for the purpose of arriving at an "amicable resolution" of any claim he may have which is compensable under the circumstances. Since we presently have no information which leads us to believe that any such claim exists, we need to hear from you. Please feel free to call me at your earliest convenience at the number shown above.

Raskin and Stein subsequently had telephone conversations in which they arranged a meeting at his office in about the beginning or middle of June (12). In that meeting they seemed to have had a wide range of settlement discussions which included the possibility of "an additional six to eight months severance or a supplemental retirement benefit" (13). Stein recalled that in the midst of those discussions, in Raskin's presence, he had called "Al Kearney, who was the vice president of Human Resources for HSSI," in order to "investigate if there was something there" (*Id.*). This meeting seems to have ended on the understanding that Stein would "get back" to Raskin, which he apparently failed to do (14–16). Not having heard from Stein, Raskin sent him a letter dated June 23 which, in its entirety, provided:

> It has been almost two weeks since we met to discuss the termination of Mr. Pierce's employment and his claim of age discrimination. It was my understanding from that meeting that you intended to advise other Hartmarx officials of the matters we discussed and that you would notify me of their response as soon as possible.
>
> Please advise me as soon as possible of Hartmarx's intentions with regard to Mr. Pierce's claim. If I do not hear from you by July 7, I shall assume that Hartmarx does not wish to discuss the matter further, and I will advise my client accordingly.

Stein did not "really recall" what had happened next, but from his file and from his Third Affidavit, which he "believed" he had personally drafted (27), he reconstructed that he had "found a job which was opening up at Wallachs", a subsidiary store of the defendants in Long Island City, and that he "might have suggested to Al Kearney", or Kearney might have suggested to him that they "offer that job to Jack Pierce" (14–15). Stein suggested this possibility to Raskin, who—in Stein's recollection—"wanted to know, and rightly so, how long the job was for" (15), which information he could not provide because the job was experimental in nature, which obviously made a fixed period of employment im-

---

**6.** Unless otherwise indicated all references are to testimony before Judge Wood on February 23, 1989.

possible (14, 22). There followed several phone conversations between Raskin and Stein in which she unsuccessfully tried to find out how long the proposed job could be expected to last (15–16).

On or about September 25th, in a telephone conversation with Raskin, Stein again offered the Long Island City job to plaintiff (16). Judge Wood made several unsuccessful efforts to find out from Stein exactly what had been said in the conversation or conversations about this renewed job offer, and specifically whether the word "release" had at any time been mentioned (18–22). Stein was not able to come up with any specific recollection, but did his best to supply a lot of logical reasons for concluding that such a word would not have been mentioned, including his own belief that plaintiff's claim never "had any merit in the first place" (19). However, Stein did say that he had made clear that the job was being offered with no assurance as to how long it would last (22); and he was able to remember telling Raskin that "we don't ordinarily hire people who are suing us" (20).

Aside from the above cited correspondence between Stein and Raskin there were two further exchanges between them—dated October 10, 20 & 23, and November 3 & 6—discussing the status of defendants' offer of employment. In her October 20 letter, Raskin specifically asserted that plaintiff might well be interested in any job offer which could be accepted without prejudice to his lawsuit, saying:

> If you are willing to make this offer of employment for an unspecified time period without regard to the settlement of Mr. Pierce's claims, he would, of course, be willing to give it serious consideration.

Stein never took note of this specific assertion but terminated the correspondence with the following statement:

> [W]hy don't we just agree to disagree about what was said in the phone conversation and get on with the lawsuit if that's what's to be.

Raskin's testimony did not materially differ from Stein's. With respect to Stein's telephone call to Al Kearney, Raskin's recollection, in its entirety, was as follows:

> I discussed also the possibility of an increased pension through an annuity or by some other means, and then I think Mr. Stein brought up, if I recall correctly, the possibility of other employment, and I said that would certainly be a possibility, and it was at that point that he, indeed, made a telephone call to Mr. Kearney, who was, I believe, the personnel manager for Hartmarx at the time, and they spoke for a few minutes, they determined that, at least at that point, there was no position available that Mr. Kearney could think of, and then Mr. Stein hung up, and so it appeared that we were left with a possible resolution of severance pay and/or pension supplement, so I said, fine, please get back to me in terms of whether you would be willing to do that. (48)

With respect to what Stein had said in tendering the Wallachs' job, Raskin testified:

> THE WITNESS [RASKIN]: The next communication I had with Mr. Stein was about September 25th, at which point he called me, he said that they have a job, or they may have a job for Jack, that it was Wallachs' warehouse sales, or involved Wallachs' warehouse sales.
>
> I asked him to describe that a bit, and he said Jack will know. He then said, I believe, I am not offering this job just to settle the case, but, of course, we don't hire people who sue us, and I said, fine, I will have to discuss the matter with my client.
>
> \*   \*   \*   \*   \*   \*
>
> THE COURT: May I just interrupt you. You said he then said, I believe—the words "I believe" are your words?
>
> RASKIN: Right.
>
> THE COURT: How good is your recollection on this point?
>
> RASKIN: The truth of the matter is that I recall very strongly his saying, we don't offer jobs to people who sue us. I am certain of that. I have some recollection of his saying, I am not

offering this just to settle the lawsuit, but that recollection is much foggier, and it is harder for me to tell if that is an independent recollection from that conversation or if that is something that I saw, because I saw it in his letter.

But the second part of that, as to we do not hire people who sue us, I am certain of (49–51).

Like Stein, Raskin had no specific recollection of whether or not the word "release" had been used. She testified on this subject in response to a question from Judge Wood:

THE COURT: Now, when you say in your October 20th letter it was impossible for him to give you the release you requested, is it your recollection that Mr. Stein used the word "release", or did he just use other language that caused you to think that a release would be necessary?

RASKIN: He used other language. I don't have a specific recollection of his using the word "release", but of the language that I described to you in the first conversation of September 25 concerning we do not hire people who sue us, and in his responses to the subsequent conversation, when I made it very clear that what I was talking about was a settlement of the matter, and that is why I was discussing a guaranteed term of employment (54–55).

## DISCUSSION

█ Judge Wood concluded as a matter of law that the communications made by defendants concerning the Wallachs' offer did not constitute an unambiguous offer of unconditional employment. *Pierce v. Tripler* (S.D.N.Y. May 10, 1989) 86 Civ. 8473, 1989 WL 51885. She accordingly granted plaintiff's *in limine* motion.

Any other conclusion would have been absurd. Raskin's testimony that the "offers" were made in the course of settlement negotiations and that the defendants never suggested that Pierce could accept a job and continue the lawsuit was direct, forthright, believable, and in accord with the documentary record. Indeed Stein's admission that he had said "we don't ordinarily hire people who sue us" eliminated any real conflict between his recollection and Raskin's. It follows that there was no basis for finding a question of fact as to whether or not defendants had made an unconditional offer of re-employment. Rule 11 sanctions are therefore appropriate.

This leaves the question of at what point in the proceedings sanctions became appropriate, and the nature of the penalty that should be imposed. At oral argument we expressed views on each of those questions which require revision in light of our subsequent study of the relevant record.

With respect to the time at which defendants' conduct should be deemed to have become sanctionable, it had seemed to us that since Judge Wood had found it necessary to hold a hearing to determine whether or not the offer of re-employment extended to plaintiff was unconditional, defendants' conduct could not be said to have been patently frivolous prior to the conclusion of such hearing. We now realize that this view was fallacious. While Judge Wood may, without a hearing, have had no way of knowing whether the statements contained in Stein's affidavit were truthful, no hearing was necessary to permit Stein to answer that question. For example, it was not necessary for Stein to be prodded by Judge Wood into admitting that he—precisely as Raskin had testified—had said "we don't ordinarily hire people who are suing us", and that the contrary position asserted in all of his four affidavits was false (26–28). We therefore conclude that sanctions should start on November 24, 1987 when Stein's first affidavit was filed.

With respect to the nature of the penalty to be imposed it had—as we indicated at oral argument—seemed to us that the penalty should be fashioned on the premise that defendants had acted in misguided good faith. This belief was predicated upon our perception of the conduct of Grace A. Newton, Esq., who had seemed to us to have been zealously and in good faith

seeking to sustain an impossible position. We did not then realize that the defendants' general counsel, director and secretary of F.R. Tripler & Co. Inc., had filed a total of four affidavits falsely describing his own personal conduct.[7] Accordingly, we approach the problem of penalties on the premise that the defendant corporation's sanctionable conduct was deliberate.

Rule 11 provides that sanctions "shall" be appropriate and "may" include reimbursing the offended party for the expenses, including counsel fees, caused by the violative conduct. Fed.R.Civ.P. 11. We conclude the appropriate penalty for defendants' sanctionable conduct to be a fine of $3,000 to be assessed jointly and severally against Stein and the corporate defendants. In the exercise of our discretionary power to compensate the plaintiff, we direct that he be reimbursed for any expenses (including counsel fees) incurred in resisting the effects of each of the Stein affidavits. This compensating direction shall, however, be effective only to the extent that the same expenses are not recovered pursuant to the first section of this opinion and order.

## CONCLUSION

In summary, with the exceptions noted above, plaintiff's fee application is granted. Likewise plaintiff's Rule 11 motion is granted to the extent above stated. Whereas both decisions require a mathematical application to the evidence in the record, counsel for the plaintiff is instructed within ten days to submit to defendants a schedule carrying into effect its interpretation of our ruling. If agreement can be reached within five days of the receipt of such schedule, counsel for plaintiff are instructed to submit a proposed order. Otherwise a conference will be arranged.

---

**7.** We still adhere to our view of Ms. Newton's good faith. She was not hired by the defendants until April 1, 1988 by which time the defendants' position had been irretrievably frozen by Stein's first and second false affidavits. It would hardly be expected of a newly hired employee to feel called upon to make an independent examination of the employer's veracity.